OPINION OF THE COURT
Bruce D. Alpert, J.
In these personal injury actions, joined for trial by order dated September 18, 1998, Nicholas Ragone, as a defendant in action numbers 1 and 3, moves, pursuant to CPLR 3211 (a) (7), for the dismissal of the complaints served on behalf of plaintiffs Mary Mulvey and Albert Foley, respectively, insofar as claims are asserted therein against him.
The court, in considering a motion to dismiss a complaint for the failure to state a cause of action, must liberally construe the challenged pleading (see, Mastrocola v County of Nassau, 248 AD2d 684), assume the truth of its material allegations, together with whatever can be reasonably inferred therefrom, and deny the application if, from its four corners, factual allegations are discerned which, taken together, manifest any cause of action cognizable at law (see, Sotomayor v Kaufman, Malchman, Kirby & Squire, 252 AD2d 555).
“Before liability can be imposed on a defendant for his or her conduct, it must be demonstrated that the defendant owes a duty of care to the plaintiff to conform to a standard of reasonable conduct in relation to the risk involved and that there was a breach of that duty. (Pulka v Edelman, 40 NY2d 781, 782, quoting from Prosser, Torts § 53, at 325 [4th ed]; see also, Palsgraf v Long Is. R. R. Co., 248 NY 339, 342; Waters v New York City Hous. Auth., 116 AD2d 384, 386.)” (Blye v Manhattan & Bronx Surface Tr. Operating Auth., 124 AD2d 106, 108-109, affd 72 NY2d 888.)
The first step in determining whether the movant owed a duty of care to one or both of the subject plaintiffs, and thus whether either of the challenged claims states a viable cause of action, is to ascertain the theory upon which recovery is sought (see, Megally v LaPorta, 253 AD2d 35).
The underlying complaints, to the extent relevant to the court’s inquiry, share the following common allegations: “[T]hat [at] all times hereinafter mentioned, the defendant!,] Nicholas ragone, voluntarily agreed and assumed the duties of being a *141 designated driver on or about September 6, 1997; [T]hat at all times hereinafter mentioned, the defendant, Nicholas ragone, knew or had reason to know that the defendant, nicole cavallo [sic], had consumed alcoholic beverages and was in a[n] intoxicated condition; [T]hat a[t] all times hereinafter mentioned, the defendant, Nicholas ragone, did violate the duties he voluntarily assumed on behalf of the plaintiff and others to be [the] designated driver, the violation of which was a direct and proximate cause of the plaintiff’s injuries and the occurring accident; [T]hat the defendant, Nicholas ragone, was negligent, careless and reckless in permitting the defendant, nicole cavallo [sic] , to operate the aforementioned motor vehicle while he knew or had reason to know that said nicole cavallo [sic] was intoxicated; [T]hat the defendant, Nicholas ragone, was negligent, careless and reckless in failing to operate said motor vehicle at the time of the incident and permitting the defendant, nicole cavallo [sic], to operate said motor vehicle when on previous occasions on the evening of September 6, 1997, he had operated the 1998 Honda motor vehicle as part of his voluntary duties as a designated driver for the plaintiff; [T]hat had Nicholas ragone continued to be the designated driver and not permitted the defendant, nicole cavallo [sic], to operate said motor vehicle in an intoxicated condition, the injuries sustained by the plaintiff would not have occurred.”
The legal theory on which the above-noted allegations are based clearly sounds in common-law negligence.
While opposing counsel and the challenged pleadings which they address presuppose the existence of a cognizable duty, the breach of which, it is asserted, would expose its assumer to potential liability, it is within the court’s province in the first instance to determine whether one member of society owes a duty of care to another.
“Duty is essentially a legal term by which we express our conclusion that there can be liability (see, generally, Green, The Duty Problem in Negligence Cases, 28 Col L Rev 1014). It tells us whether the risk to which one person exposes another is within the protection of the law.” (De Angelis v Lutheran Med. Ctr., 58 NY2d 1053, 1055.)
When reduced to its essence, the claims asserted by the respective plaintiffs are predicated upon the movant’s failure to control the conduct of a codefendant, Nicole Cuviello, the owner/operator of the motor vehicle which is alleged to have been operated at an excessive rate of speed and to have collided with an off-road object.
*142 “In the ordinary circumstance, common law in the State of New York does not impose a duty to control the conduct of third persons to prevent them from causing injury to others; liability for the negligent acts of third persons generally arises when the defendant has authority to control the actions of such third persons (D’Amico v Christie, 71 NY2d 76, 88-89; see, Eiseman v State of New York, 70 NY2d 175, 191, supra; Pulka v Edelman, 40 NY2d 781, 783; see generally, Restatement [Second] of Torts §§ 314, 315). This is so, we have said, even where ‘as a practical matter’ defendant could have exercised such control (D'Amico v Christie, 71 NY2d 76, 88, supra; Pulka v Edelman, 40 NY2d 781, 784, supra).” (Purdy v Public Adm’r of County of Westchester, 72 NY2d 1, 8.)
Though the record is replete with references to the voluntary assumption of a duty, the use of such phraseology begs the question. The plaintiffs have cited no legal authority for the specific proposition they seek to advance, nor has independent research of case law within this State identified precedent recognizing the viability of a corresponding cause of action. Thus, the issue raised appears to be a matter of first impression in New York.
“The common law of torts is, at its foundation, a means of apportioning risks and allocating the burden of loss. While moral and logical judgments are significant components of the analysis, we are also bound to consider the larger social consequences of our decisions and to tailor our notion of duty so that ‘the legal consequences of wrongs [are limited] to a controllable degree’ (Tobin v Grossman, 24 NY2d 609, 619; see, Pulka v Edelman, 40 NY2d 781; Ultramares Corp. v Touche, 255 NY 170).” (Waters v New York City Hous. Auth., 69 NY2d 225, 229.)
“A line must be drawn between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit. It is always tempting, especially when symmetry and sympathy would so seem to be best served, to impose new duties, and, concomitantly, liabilities, regardless of the economic and social burden. But, absent legislative intervention, the fixing of the ‘orbit’ of duty, as here, in the end is the responsibility of the courts (see Palsgraf v Long Is. R. R. Co., 248 NY 339, 343, 345).” (De Angelis v Lutheran Med. Ctr., supra, at 1055.)
Application of the preceding legal principles militates against affording recognition to the challenged causes of action. While the court has empathy for those that sustained personal *143 injuries in the underlying accident and is neither inured by nor insensitive to their pain and suffering, it is loathe to impose new duties and extend exposure to tort liability in settings not previously recognized under the common law or statutorily mandated.
Independent research reveals no reported case which recognized the viability of a cause of action directed against an uncompensated designated driver for the premature termination of such voluntary service other than Morin v Keddy (1993 WL 451449 [Conn Super Ct, Hartford-New Britain, Oct. 25, 1993, Hennessey, J.]).
The pertinent allegations therein can be summarized as follows: Defendants Robert Pepe and Kenneth Keddy, along with two others, attended a party held at the premises of a corporate codefendant. Pepe, who was then under the legal drinking age, agreed to act as designated driver, promising not to consume alcoholic beverages and to drive himself and the others home in the Keddy vehicle at the party’s conclusion. Notwithstanding his commitment to abstain from alcohol, Pepe, as well as his three “charges”, consumed alcoholic beverages. Both he and Keddy became intoxicated and were requested to leave the party before its conclusion. Pepe then drove the group in the Keddy vehicle to his (Pepe’s) home, whereupon he exited the vehicle, entered the home and remained thereat. Shortly after Keddy re-assumed control of his vehicle, it was involved in a tragic and fatal accident.
In denying Pepe’s motion challenging the sufficiency of various claims asserted against him, the court held (1993 WL 451449, 3): “Viewing the facts alleged in the light most favorable to the plaintiffs, a reasonable person in Pepe’s circumstances would anticipate that agreeing to act as designated driver would encourage Keddy to become intoxicated. A reasonable person in Pepe’s circumstances would anticipate that allowing Keddy, who was visibly intoxicated, to drive may lead to a fatal automobile accident. Accordingly, we conclude that the plaintiffs have pled sufficient facts establishing a legal relationship between the parties which gives rise to a duty of care owed to the plaintiffs.” (Emphasis supplied.)
“LAJlthough virtually every untoward consequence can theoretically be foreseen ‘with the wisdom born of the event’ (Greene v Sibley, Lindsay & Curr Co., 257 NY 190, 192)” (Di Ponzio v Riordan, 89 NY2d 578, 583), the existence of a legal duty is not to be discerned through the prism of foreseeability (see, Strauss v Belle Realty Co., 65 NY2d 399, 402; see also, Megally v LaPorta, supra, at 653).
*144 On the contrary, foreseeability serves to shape and define the scope of a duty cognizable under the law. As noted by the Appellate Division, First Department, in Blye v Manhattan & Bronx Surface Tr. Operating Auth. (124 AD2d 106, 109, supra), “[t]he concept of foreseeability is a critical factor in defining the boundaries of that duty [citations omitted], but it is never the avenue by which to create a duty which does not otherwise exist. [Citation omitted.]” (Emphasis supplied.)
Thus, despite the natural appeal that a legal remedy would afford in this context, the court, in light of the preceding legal principles, obtains but limited guidance from the decision in Morin (supra).
Legal duty questions are customarily resolved through resort to common concepts of morality, logic, science and public policy (see, Tenuto v Lederle Labs., 90 NY2d 606, 612; see also, De Angelis v Lutheran Med. Ctr., 58 NY2d 1053, supra).
Though it would violate neither moral principles nor scientific tenets to expose a designated driver to liability in this context, it would be, in this court’s view, both paradoxical and violative of public policy to recognize the viability of the underlying causes of action, for were life breathed into the fabric thereof, it would likely discourage and deter others from serving in that capacity.
“One should not be held legally responsible for the conduct of others merely because they are within our sight or environs. Neither should one be answerable merely because there are others whose activities are such as to cause one to envision damages or injuries as a consequence of those activities. In this respect, a moral duty should also be distinguished from a legal duty. The former is defined by the limits of conscience; the latter by the limits of law. A person may have a moral duty to prevent injury to another, but no legal duty. While a court might impose a legal duty where none existed before (see, generally, 1A Warren’s Negligence, § 3.13, subd [2], pp 166-167), such an imposition must be exercised with extreme care, for legal duty imposes legal liability.” (Pulka v Edelman, 40 NY2d 781, 785-786, supra [emphasis supplied].)
It is beyond peradventure that legislative power in this State is vested, pursuant to article III of the New York Constitution, in the Senate and Assembly, whose function it is to choose among conflicting considerations, to decide what the policy of the law shall be and to mold the law according to its will, subject only to constitutional restrictions (see, 20 NY Jur 2d, Constitutional Law, § 163).
*145 The Legislature “[m]ay change the common law so as to create new duties and liabilities which theretofore did not exist, and it is not a valid objection to a statute that it creates a right of action and imposes a liability unknown to the common law. The rule has been stated that the legislature may create new offenses, enlarge the scope of civil remedies, and fasten responsibilities for injuries on persons against whom the common law gives no remedy.” (20 NY Jur 2d, Constitutional Law, § 165.)
It has not eschewed its responsibilities in this realm. On the contrary, Dram Shop enactments on the civil side (see, General Obligations Law §§ 11-100, 11-101) and statutes which prohibit or restrict the sale, procurement or possession of alcoholic beverages (see, Alcoholic Beverage Control Law §§ 65, 65-a, 65-b, 65-c), or which penalize those with the temerity to abuse their motor vehicle privileges (see, Vehicle and Traffic Law §§ 1192, 1192-a, 1193, 1194, 1194-a, 1196, 1197, 1198), are prime illustrations of the Legislature’s immersion into one of the more significant and intractable problems that plague society, particularly in the suburban and rural areas most dependent upon the automobile for transportation.
Given the breadth of the existing legislative initiatives, a judicially created remedy, as urged by opposing counsel, would constitute a substantial invasion into the legislative domain and a usurpation of its prerogatives and function.
For the reasons hereinabove articulated, the court declines to recognize the challenged causes of action as viable, inviting the most careful, deliberate and reasoned consideration of this subject by the Legislature.
Accordingly, the application at bar is granted and the claims raised by plaintiffs Mulvey and Foley, respectively, against defendant Ragone, are dismissed pursuant to CPLR 3211 (a) (7). The actions against the remaining defendants are severed and continued.